UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| DEANNA L. JOHNSON<br>117 Huron Trail<br>Winchester, VA 22602,<br><br>    Plaintiff,<br><br>    v.<br><br>STAFFING ALTERNATIVES, INC.<br>(D/B/A SAI)<br>656 Quince Orchard Road, Suite 710<br>Gaithersburg, MD 20878<br><br>    Defendant. | Civil Action No.<br><br>TRIAL BY JURY DEMANDED |

## COMPLAINT

COMES NOW Plaintiff Deanna L. Johnson, by and through undersigned counsel, and states as follows:

### PRELIMINARY STATEMENT

1. Plaintiff Deanna L. Johnson ("Ms. Johnson or "Plaintiff") brings this action for legal and equitable relief to redress the injuries done to her by her former employer, Defendant Staffing Alternatives, Inc. ("SAI"), through SAI's unlawful discrimination and retaliation against (up to and including termination of) Ms. Johnson on the basis of her disabilities. Ms. Johnson brings this action pursuant to Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12111 *et seq.*, as amended by the ADA Amendment Act of 2008; and Section 503 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 793, as amended, for her injuries arising from SAI's violations thereof.

## JURISDICTION AND VENUE

2. Jurisdiction of this court is founded pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 12117.

3. Venue lies in this District pursuant to 28 U.S.C. § 1391(b) on the ground that Defendant is a corporation that transacts a significant amount of business in the Commonwealth of Virginia, including within the Eastern District of Virginia.

4. Ms. Johnson has exhausted her administrative remedies, having filed a formal complaint with the Office of Federal Contract Compliance Programs, U.S. Department of Labor ("OFCCP"), on February 16, 2016. The OFCCP issued a "Notice of Right to Sue," and this suit has been brought within 90 days of Ms. Johnson's receipt of such Notice.

## PARTIES

5. Plaintiff Deanna L. Johnson is a citizen of the United States and a resident of the Commonwealth of Virginia. Ms. Johnson was an employee of Defendant, Staffing Alternatives, Inc. (d/b/a SAI) (SAI) until October 2, 2015, when SAI eliminated her position.

6. SAI is a nonexempt government contractor subject to the requirements of Section 503 of the Rehabilitation Act of 1973. Additionally, SAI is an employer of 15 or more persons subject to Title I of the Americans with Disabilities Act of 1990. SAI, although its headquarters are in Maryland, does and, for all times relevant to this complaint, did business for clients located in the Commonwealth of Virginia and within the District.

## FACTS

7. On April 27, 2012, Ms. Johnson began working for SAI from her home office in Spokane, Washington, as an independent contractor. She was hired by SAI as a full-tine employee on May 12, 2012. Ms. Johnson's job title was Director of Contracts and

Administration. She was also hired as SAI's General Counsel.  Ms. Johnson moved from Spokane, Washington, to Gaithersburg, Maryland, and began working at SAI Headquarters on May 29, 2012.

8. According to SAI's offer letter dated May 11, 2012, Ms. Johnson was responsible for maintaining all contracts and ensuring contract compliance, responding to all requests for contractual information or disputes, issuing subcontract modifications, and resolving contractual issues pursuant to the direction of Patrick W. Stoup, SAI's Chief Executive Officer.  Ms. Johnson was also responsible, initially, for updating various company policies and procedures, handbooks, and processes to reflect current company information and ensuring compliance with various federal and state rules and regulations.  Ms. Johnson was to report directly to Mr. Stoup.

9. Ms. Johnson's reporting relationships began to change some time in 2014 after Lynn Muska was promoted from Chief Financial Officer to President and CFO, whereby Ms. Johnson was to report directly to Ms. Muska.  On August 7, 2015, Ms. Johnson's reporting relationship changed again when, during a meeting, Mr. Stoup informed Ms. Johnson that she would be reporting directly to him again.  On August 20, 2015, Ms. Johnson's reporting relationship changed once more, when Sharon Rosado, Director of Human Resources, informed her that Mr. Stoup and Ms. Muska decided that Jennifer Iams would be Ms. Johnson's new supervisor.

10. While at SAI, Ms. Johnson established herself as an extremely effective and hard-working employee with an extensive knowledge of government contracting law.  Ms. Johnson's exceptional performance was recognized with several pay increases and bonuses.

11. However, by the late spring to early summer of 2015, both Mr. Stoup and Ms. Muska knew, or had reason to know, that Ms. Johnson was suffering chronic pain from

endometriosis, that her condition was worsening, that she was receiving increased medical treatments, and that she was interviewing doctors who could perform surgery.

12. When Ms. Johnson started going to the doctor more frequently for treatment, Mr. Stoup and Ms. Muska both commented about her increased absences from work in a disapproving manner. Ms. Johnson was hoping to wait until the end of the summer to get the surgery done, but Mr. Stoup and Ms. Muska both urged her to do it sooner for SAI's business reasons.

13. Mr. Stoup and Ms. Muska knew, or had reason to know, that Ms. Johnson suffered from varying disabling conditions.

14. Ms. Johnson began experiencing a recurrence of chronic pain associated with migraines in September or October of 2012. The pain and continuous vomiting were difficult to hide in such a small office, and Mr. Stoup and Ms. Muska were made aware of this condition at or about that time. On February 17, 2015, Ms. Johnson personally delivered a letter written by her physician to the then Human Resources Director, Melissa Finn, regarding her migraines.

15. In August or September of 2014, Ms. Johnson suffered from what was diagnosed as a recurrence of endometriosis. Mr. Stoup knew of this because he granted permission to one of Ms. Johnson's colleagues, Bob Gaffin, to accompany her to her first appointment with a specialist.

16. Mr. Stoup and Ms. Muska knew or should have known that Ms. Johnson received an additional diagnosis of adenomyosis in August of 2015.

17. In October of 2000, Ms. Johnson underwent a series of major surgeries for complications arising from an endometrial cyst, resulting in the loss her ovaries and tubes; rendering her completely infertile. This also caused psychological conditions including major

depression, anxiety, and PTSD.  Mr. Stoup and Ms. Muska learned this throughout the time Ms. Johnson was employed at SAI, as Ms. Johnson had worked closely with them and developed what she thought were close bonds.  When the pain came back it took her breath away, brought her to tears on occasion, and on other occasions she was unable to walk or stand up straight.

18. By May of 2015, Mr. Stoup and Ms. Muska, upon learning that Ms. Johnson's chronic pain from endometriosis was worsening and that she would require surgery, subjected Ms. Johnson to an increasingly hostile work environment.  Specifically, the hostilities consisted of using verbal intonations indicating an attempt to demean her rather than to seek information, gas-lighting, mischaracterizing work performance after giving conflicting instructions, removing her essential work functions and authority, yelling at her inches from her face, cussing at her while berating her, and threatening to terminate her employment.

19. By May of 2015, Mr. Stoup and Ms. Muska severely restricted Ms. Johnson's authority to speak with Federal Government officials, subcontractors, employees, and others about contract matters.  Yet, Mr. Stoup and Ms. Muska expected Ms. Johnson to be well informed of the contract matters even though they had frozen out key sources of information. Ms. Johnson was required to work on matters for clients, including the National Geospatial-Intelligence Agency, without being allowed to communicate with those clients. This created additional work for Ms. Johnson that translated into additional hours that were unnecessary.  Had Ms. Johnson been able to perform her usual and customary job functions, she would not have needed to go back and conduct additional research and type lengthy emails to get answers to questions she had about key events.

20. On June 4, 2015, Mr. Stoup removed Ms. Johnson's responsibility for the U.S. Forest Service RFP Proposal response and handed it over to Ms. Iams.

21. Throughout the summer of 2015, Ms. Johnson's essential job functions were eroded as Mr. Stoup and Ms. Muska removed her from projects, restricted her authority, and refused to include her in meetings or otherwise communicate with her about contract-related and legal matters. Essentially, they took actions that interfered with Ms. Johnson's job performance, in an effort to render her ineffective. Although Ms. Johnson was experiencing increased pain from her condition during this time, and seeking medical treatment, she was still able to fully perform all essential functions of her job.

22. Throughout June and July of 2015, Ms. Johnson brought her concerns directly to Mr. Stoup about the hostile manner in which Ms. Muska was speaking to her, the tone of her communications, and Ms. Johnson's concerns about Ms. Muska taking over her essential job functions. Each time, Mr. Stoup promised to address these matters with Ms. Muska "in a couple of weeks." However, nothing improved. As a matter of fact, things went downhill, as Ms. Muska outright refused to speak to Ms. Johnson and resorted to communicating with her only via email. This strain in communications made Ms. Johnson's job much more difficult than it reasonably had to be.

23. On June 24, 2015, Ms. Johnson wrote a complaint to Sharon Rosada, Human Resources Director, about how Ms. Muska was treating her.

24. On July 29, 2015, Ms. Muska sent Ms. Johnson an email inquiring about the status of ESAS subcontract modifications. This email unjustifiably and negatively evaluated Ms. Johnson's work performance; accusing her of not being proactive. In fact, quite the opposite was true. Ms. Johnson approached Ms. Muska in May of 2015 about preparing the Subcontract Agreements (templates) in advance of the actual award. At that time, Ms. Muska instructed her to "hold off" on the ESAS Subcontracts until the end of August of 2015 because she did not

think ESAS was going to be awarded until September of 2015 or later. Nonetheless, Ms. Muska unjustifiably berated Ms. Johnson and her work performance.

25. On August 3, 2015, Ms. Johnson sent an email to Ms. Muska about the status of the ESAS Subcontract Agreements. Since email was Ms. Johnson's only permissible avenue of communication with Ms. Muska because she refused to speak with Ms. Johnson, their emails contained much unnecessary "back and forth" with questions, updates, probing for answers, and clarifications. Ms. Muska's tone in responding to Ms. Johnson's email was hostile.

26. Mr. Stoup and Ms. Muska spoke to Ms. Johnson in a hostile, demeaning, and abusive manner once they became aware of her disabilities. Specifically, Ms. Muska would preface her questions to Ms. Johnson about her work with the phrase "Why would you . . ." with verbal intonations indicating an attempt to demean Ms. Johnson rather than to seek information.

27. As another example of hostile communications, on August 11, 2015, at about 3:00 p.m., Mr. Stoup yelled at Ms. Johnson for performing a routine task (keeping copies of task orders with the contract file for ESAS) and made offensive remarks about her disabilities while yelling and telling her: "Why don't you take long term disability! You're on leave effective immediately! Your services are no longer needed! Get the f*** out of my office! You're irritating me!"

28. On August 13, 2015, Ms. Johnson was excluded from an ESAS meeting concerning the impact of changes to a contract on contract compliance even though she was responsible for ensuring contract compliance. This interfered with her ability to perform her essential job functions of contractual and legal compliance, awareness of contract modifications, and other contractual/operational matters affected by the changes. Ms. Johnson felt as though there was no reasonable way that she could perform these essential duties to the best of her

abilities while being excluded from meetings and communications regarding these contractual matters. This was deliberate. When Ms. Johnson realized there was a contracts meeting, she got up from her desk to enter the conference room where the meeting was being held. Mr. Stoup shut the door in her face and gave her a dirty look that clearly indicated she was unwelcome.

29. The stress of the hostile work environment Ms. Johnson endured worsened her disabilities. On August 8, 2015, she personally delivered a letter written by her physician to Ms. Rosado, citing "tremendous stress", "lack of sleep," and "anxiety symptoms" that worsened some of Ms. Johnson's medical conditions. The physician's strong recommendation was that Ms. Johnson's hours be reduced to no more than 60 hours per week, and that she get at least eight hours of sleep at night.

30. At the time, Ms. Johnson had been putting in more than 60 hours per week and working straight through some nights with no sleep. The job requirements, as dictated by Ms. Muska and Mr. Stoup, were resulting in a drastic increase in hours, shrinking deadlines (necessitating increased work hours to meet deadlines), the addition of other projects, and continually changing priorities. It seemed as though Mr. Stoup and Ms. Muska were trying to see how much pressure they could put Ms. Johnson under to get her to quit.

31. On August 18, 2015, Ms. Johnson submitted a written request for reasonable accommodation for her chronic pain and also for major depression, panic disorder, and post-traumatic stress disorder.

32. On August 20, 2015, Ms. Johnson was assigned to a full-time telework position but was denied access to SAI's shared drive. On that day, Ms. Johnson explained to Ms. Rosado that denying her access to the "Staff Share" would prevent her from performing her essential job

8

functions. She also requested clarity on her role and responsibilities. She asked about what information would be needed from her physician, who she was visiting the next week.

33. However, instead of engaging in a good faith effort to accommodate Ms. Johnson in the continued performance of her job, on or about August 24, 2015, SAI placed Ms. Johnson on medical leave with a return date of December 1, 2015, and represented that they would hold her position for her and have a complete job description upon her return.

34. That turned out to be a misrepresentation because, on October 1, 2015, while Ms. Johnson was on medical leave, SAI notified her that, due to a restructuring, one that, despite being SAI's chief legal officer and director of administration, Ms. Johnson had known nothing about, her position was being eliminated effective October 2. According to an October 1 letter that Ms. Johnson received, this purported restructuring was intended to reduce overhead costs.

35. Had a need to cut overhead costs been the true motivating factor for eliminating Ms. Johnson's position, then it is difficult to understand why certain other expenditures of SAI and Mr. Stoup were also not subject to the cost-cutting measures SAI claimed were required. Among the expenditures which seem not to have been cut were:

36. Non-performing relatives, including Mr. Stoup's stay-at-home wife and daughter-in-law living in Spokane, Washington, were kept on SAI's payroll.

37. Mr. Stoup's Russian mistress was kept on the payroll and her salary was increased to at least $85,000. She has not provided any services to SAI, but has provided services to Mr. Stoup of a sexual nature. She advertises her "massage services" in Craig's List ads and has received reviews from TheEroticReview.com, USASexGuide.info, TheEroticArchive.com, and MPReviews.com.

38. In 2016, Mr. Stoup used SAI funds to hire counsel to help his mistress defend allegations of sex trafficking and prostitution.

39. The mistress's salary is included in SAI's submissions to the Federal Government and may be included in SAI's overhead costs for its headquarters staff.

40. Mr. Stoup's use of SAI funds to pay the mistress violates Federal Acquisition Regulation (FAR) 52-22-50, Combatting Trafficking in Persons.

41. SAI spent a record amount of money (approximately $30,000) on its holiday party at the Marriott Crystal City Gateway on December 5, 2015.

42. While abolishing Plaintiff's position for budgetary reasons, SAI gave raises and bonuses to other SAI employees.

43. SAI recently purchased new software and equipment.

44. SAI showed a profit for year-end 2015.

## FIRST CAUSE OF ACTION
### Violation of the ADA

45. Plaintiff herein adopts and incorporates by reference all of the allegations set forth in paragraphs 1 through 44 as if originally pleaded herein.

46. At all times relevant hereto, Plaintiff was a qualified individual with known disabilities as those terms are defined by the ADA.

47. At all times relevant hereto, Plaintiff was able to perform the essential functions of her position with reasonable accommodation.

48. Nonetheless, Defendant refused to provide the reasonable accommodations requested or to otherwise engage in the interactive process, in violation of the ADA.

49. Defendant's wrongful actions complained of herein, including the wrongful elimination of Plaintiff's position, were taken because of Plaintiff's disabilities, in violation of the ADA.

50. As a direct and proximate result of Defendant's actions, Plaintiff has suffered, continues to suffer, and will in the future suffer injury and damages, including embarrassment, humiliation, severe mental anguish, pain, suffering, loss of income, litigation expense including attorney's fees, medical expense, consequential damages, and other injury.

## SECOND CAUSE OF ACTION
### Violation of the ADA – Retaliation

51. Plaintiff incorporates by reference and re-alleges the proceeding paragraphs as fully set forth herein.

52. Plaintiff engaged in protected activity when she requested reasonable accommodation in August of 2015. In direct response to her request, Defendant placed Plaintiff on forced medical leave and, on October 1, 2015, told her that her position would be eliminated on October 2.

53. As a direct and proximate result of Defendant's actions, Plaintiff has suffered, continues to suffer, and will in the future suffer injury and damages, including embarrassment, humiliation, severe mental anguish, pain, suffering, loss of income, litigation expense including attorney's fees, medical expense, consequential damages, and other injury.

## THIRD CAUSE OF ACTION
### Violation of the Rehabilitation Act

54. Plaintiff incorporates by reference and re-alleges the proceeding paragraphs as fully set forth herein.

55. Defendant, a federal contractor, discriminated against Plaintiff based on her disabilities in violation of Section 503 of the Rehabilitation Act.

56. As a direct and proximate result of Defendant's actions, Plaintiff has suffered, continues to suffer, and will in the future suffer injury and damages, including embarrassment, humiliation, severe mental anguish, pain, suffering, loss of income, litigation expense including attorney's fees, medical expense, consequential damages, and other injury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays this Court:

(1) To award her, under the ADA and the Rehabilitation Act, all the back pay and front pay and fringe benefits she has lost as a result of Defendant's unlawful discrimination and retaliation against her;

(2) To award her, under the ADA and the Rehabilitation Act, compensatory damages in an amount to be determined at trial;

(3) To award her, under the ADA and the Rehabilitation Act, punitive damages in an amount of no less than $500,000;

(4) To award her, under the ADA and the Rehabilitation Act, attorney's fees and other litigation costs reasonably incurred in this action, including any expert witness fees expended;

(5) To award her a separate amount, in addition to the award against Defendant, to offset the adverse tax effects of lump sum payments of damages and/or back or front pay;

(6) To award her appropriate declaratory relief declaring the acts of Defendant violative of the ADA and Rehabilitation Act;

(7) To award her such other and further relief which the Court deems proper.

## **JURY DEMAND**

Plaintiff respectfully requests a jury trial on all issues.

                              Respectfully submitted,

                              DEANNA L. JOHNSON

                              By:  /s/ _____

                              ROSA M. KOPPEL
                              (Virginia State Bar No. 88172)

                              Law Offices of Larry J. Stein, LLC
                              4023 Chain Bridge Road, Suite 10
                              Fairfax, Virginia  22030
                              Telephone:  (703) 383-0300
                              Facsimile:  (703) 736-3115
                              Email:  rosakoppel@ljslaw.net

                              Attorney for Plaintiff Deanna L. Johnson

Dated:  March 1, 2017